UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
—————————————————————————x

DANIEL JEAN-GILLES,

                    Plaintiff,

         - against -                        05 Civ. 9377 (CM)

COUNTY OF ROCKLAND,

                    Defendant.
—————————————————————————x

**DECISION AND ORDER
DENYING PLAINTIFF AND DEFENDANT'S
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

McMahon, J.:

       Plaintiff Daniel Jean-Gilles brought this action to enjoin the defendant County of

Rockland from enforcing an allegedly unconstitutional County policy that prohibits County

employees from speaking publicly on controversial matters.  The existence of the purported

policy came to light during the trial of plaintiff's last lawsuit against Rockland County and its

County Executive, Scott Vanderhoef.  In that case, Jean-Gilles was trying to prove that

Vanderhoef had refused to promote plaintiff to the position of Commissioner of the County's

Human Rights Commission (for which plaintiff worked and still works) because he was black

and because he had protested the County's lack of commitment to advancing the careers of

African-Americans like himself.  Jean-Gilles v. County of Rockland, No. 00-CV-4861

(McMahon, J.) (hereinafter "Jean-Gilles I").

       Plaintiff seeks only injunctive relief.  He moves for summary judgment pursuant to Fed.

R. Civ. P. 56, largely on the basis of the testimony adduced at the last trial.

The County has filed a cross-motion for summary judgment.  It contends that (1) no such policy exists, (2) plaintiff lacks standing to file this claim, and (3) plaintiff's lawsuit is barred by res judicata.

For the reasons stated below, I conclude that plaintiff has standing to pursue this claim under Second Circuit precedent and plaintiff's lawsuit is not barred.  Because there are disputed issues of fact, the matter will go to trial.

## I. <u>Facts</u>

### A. Background

Plaintiff Daniel Jean-Gilles, a black Haitian-American, is a resident of defendant Rockland County (the "County") and an employee of the County government.  (Compl. ¶ 3.) Since 1992, he has worked as an investigator for the Rockland County Human Rights Commission ("HRC"), the agency responsible for investigating claims of discrimination in the County.  (<u>Id</u>.)

Mr. Jean-Gilles is active in local politics and community organizations:  He served as Nyack village trustee from 1988-1991 (Declaration of John D. Winter in Support of Defendant's Summary Judgment Motion ("Winter Decl."), Ex. D) and as head of the Nyack Democratic Party (Winter Decl., Ex. C), participates in the Nyack chapter of the NAACP (Winter Decl., Ex. B), and is often quoted in the local press for his thoughts regarding Haitian political developments (Winter Decl., Ex. D-E).  It is Jean-Gilles' local activism – and the County's subsequent treatment of Jean-Gilles – that sowed the seeds for both this lawsuit against the County and the lawsuit he brought six years ago.  Testimony adduced at the trial of his earlier lawsuit caused plaintiff to conclude that the County maintained the illegal prior restraint that forms the basis of

2

this action.

In 1996, Jean-Gilles – acting in his capacity as an NAACP representative – organized a community meeting to discuss the impact of a planned mall development and new ferry landing on the local black community.  (Winter Decl., Ex. B.)  Approximately twenty citizens attended the gathering, as did members of the local press who later interviewed Jean-Gilles about his opposition to the mall and ferry projects.  (Id.)  In the interview, Jean-Gilles said that the ferry project would increase housing prices, which could drive the mostly working-class black community out of Nyack.  (Id.)  He also noted his concerns regarding the local black community's lack of political cohesiveness, and the need for the community to "remain vigilant" over its interactions with the Nyack Police Department.  (Id.)  The article did not identify Jean-Gilles as a County employee.

In response to this article, the Mayor of Nyack and the County's Director of Tourism and Communications, Heather Duke, grew concerned with Jean-Gilles' attending "public events in high-profile positions [and] taking controversial positions on political . . . issues."  (Bergstein Affirmation in Support of Plaintiff's Summary Judgment Motion ("Bergstein Aff."), Ex. 1 at 24.) The two community leaders approached the County Chief Executive, C. Scott Vanderhoef, who in turn asked his then-Director of Administration and Community Affairs, Susan Sherwood, "to find out more information."  (Id. at 25.)

Ms. Sherwood agreed that these concerns were valid and a meeting was necessary:  "It's very important the Human Rights Commission be above the political prey [sic]; that it's objective, apolitical, nonbiased, noncontroversial; that people be able to know that when they come there, things are handled in a fair and impartial manner."  (Id.)  Moreover, Ms. Sherwood

3

testified that, "It alarmed me that [Jean-Gilles] would be speaking to the press and implying that there were going to be changes that could so dramatically impact the village and that he had already been so involved with that it would be difficult for him to take a fair stance in solving whatever problems may come in the future." (Id. at 45.)  While acknowledging that the HRC's jurisdiction did not extend to either the ferry or the mall projects, Sherwood maintained, "Different issues can come out of a major economic development....  Anything can happen, and it's important not to take a stand for or against something....  [Jean-Gilles] could take a position on the ferry.  He should not do it publicly...." (Id. at 45-46.)

During Sherwood's meeting with plaintiff, Jean-Gilles questioned Sherwood's right to ask him "about his political speech that he engaged in outside of work," and indicated that he would not respond to Sherwood's questions unless she directed him to answer.  (Id. at 49-50.) She declined to do so.  However, Sherwood remained "concerned" that plaintiff "wouldn't be fair and impartial." (Id. at 50.)

On September 13, 1996, in a subsequent meeting with plaintiff about his public speaking, Sherwood, Vanderhoef, Chief of Staff Robert Winzinger, and Commissioner of Human Rights Cassandra McIntyre – Jean-Gilles' supervisor – "tri[ed] to tell him . . . that [his public activism] could well give the perception and impression that he was [biased and prejudiced] if he continued to get himself involved in highly controversial issues." (Id. at 52.)  The "message, if not the exact words" of the meeting was that "it was important for [Jean-Gilles] not to get involved in anything political and controversial." (Id. at 56.)  Vanderhoef told plaintiff that the HRC and "especially an investigator, had to be seen as absolutely neutral to all groups . . . and that to side with one side or another would have a chilling effect for others who might seek

4

redress" from the Commission.  (Bergstein Aff., Ex. 2 at 11.)  However, Vanderhoef

acknowledged that no evidence existed demonstrating that Jean-Gilles' political activism had

actually chilled potential complaints.  (Id. at 21.)

Plaintiff responded that "it was his right as an employee" to speak publicly on local

social and political issues.  (Id. at 21.)  Vanderhoef disagreed:  "Ordinarily, that's true, but in the

human rights field, it's a very special field."  (Id.)

Following this meeting, Vanderhoef sent plaintiff a letter explaining that the meeting was

"neither a disciplinary session, nor a step in that direction."  (Bergstein Aff., Ex. 6.)  However,

Vanderhoef reiterated that Commission representatives remained concerned about plaintiff's

"recent activities in public" and enclosed copies of the newspaper articles that had given rise to

those concerns.  (Id.)

Vanderhoef and Sherwood encouraged Commissioner McIntyre "to try to work with

[plaintiff] so that he would not get himself into the middle of political imbroglios."  (Bergstein

Aff., Ex. 1 at 53.)  While Sherwood hoped that plaintiff "had learned something from our

meeting and our letter," her concerns were heightened by plaintiff's "rebellious" attitude towards

her and Vanderhoef.  (Id. at 53-54.)

Almost one year later, in June 1997, the Clarkstown Courier reported that Jean-Gilles had

sent a letter to the County Legislature, complaining of gross mismanagement and understaffing

at the HRC.  (Winter Decl., Ex. C.)  Specifically, Jean-Gilles alleged that between two and five

seats on the thirteen-member HRC board were unfilled; as a result, the HRC was unable to carry

out its mission.  (Id.)  Jean-Gilles further alleged that this failure to fill the thirteen seats led to a

lack of "'independent oversight'" of the HRC, which resulted in HRC employees being

"'subjected to aggravated harassment, and a hostile and intimidating work environment and interrogation by the chief administrator of the County . . . without representation and without charge." (Id.)

Two years later – after Commissioner McIntyre was suspended from the HRC in April 1999 and subsequently resigned in August 1999 (Vanderhoef Trial Test., Jul. 26, 2004 at 65) – plaintiff applied for the position of HRC Commissioner. (Winter Decl., Ex. G at ¶¶ 9-11.) In February 2000, plaintiff learned that he had not been promoted to Commissioner, and that the position had been given instead to a "non-black" person. (Id. at ¶ 13.)

### B. Jean-Gilles I

In June 2000, Jean-Gilles commenced Jean-Gilles I. In his complaint, plaintiff claimed that (1) Vanderhoef, acting on behalf of the County, "has carried out, and continues to implement, a policy and practice of failing to employ a reasonably proportionate number of African-Americans and other black persons to high-ranking county positions"; (2) Vanderhoef retaliated against plaintiff for repeatedly voicing his opposition to Vanderhoef's "failure to fairly consider and hire qualified black persons"; and (3) Vanderhoef refused to appoint Jean-Gilles as HRC Commissioner both because Jean-Gilles is black and because he opposed the County's racially discriminatory policy. (Id. at ¶¶ 17-21.)

At the Jean-Gilles I trial in July 2004, Ms. Sherwood – then Vanderhoef's chief of staff – testified as a defense witness. She had not been deposed during pre-trial discovery.

While being questioned about the September 13, 1996 meeting with Jean-Gilles, Sherwood disclosed the existence of an unwritten County policy that regulates County employees' public speech in order to further "the impression of the department as being

impartial."  (Bergstein Aff., Ex. 1 at 54, 57.)  According to Sherwood, the County maintains a

policy that requires "county employees and department heads [who] speak with the press . . . to

check in with our office for guidance and so that we know how to respond if a question comes to

us."  (Id. at 48) (hereinafter, the "check-in policy.")  Sherwood testified that this check-in policy

did not apply to County employees speaking as private citizens "unless [the speech] connects, as

it does in this case, I believe" with the employee's job.  (Id. at 49.)  Sherwood did not limit the

applicability of this policy to commissioners and department heads; she clearly testified that it

applied to "county employees" and she clearly indicated that it applied to Jean-Gilles because

"in this case" his speech "connects" to his employment with county government.

Sherwood further stated that the County had no written regulations about when County

employees could or could not express themselves on matters of public importance (id. at 48), but

that she believed the policy to mean that employees should refrain from "controversial political

activity."  (Id. at 56.)  Sherwood stated that she herself had "told an employee acting for

Rockland County . . . that she should not be involved in controversial political activity" that

"would be reported in the press" – or otherwise "impact upon your job" – and that Sherwood

understood that so "instruct[ing] employees" was "the policy of the County."  (Id. at 56-57.)

Sherwood further testified that she heard Vanderhoef articulate this unwritten policy to "a

number of employees in the County" – other than Jean-Gilles – "Numerous times."  (Id. at 58.)

Indeed, Sherwood stated that Vanderhoef reiterated this policy "Every year" at ". . . cabinet

meetings in which commissioners and department heads would be reminded of press policy and

public appearance policy."  (Id.)  Sherwood was not asked, and did not specify, whether the

"number of county employees" to whom Vanderhoef articulated the unwritten policy included

persons who would not have been present at cabinet meetings (attended by commissioners and department heads who, as policymakers, can lawfully be subjected to certain restraints on their political speech.  See McEvoy v. Spencer, 124 F.3d 92, 102 (2d Cir. 1997)).

Sherwood testified that she had intervened after Jean-Gilles' 1996 public speech regarding the ferry and mall development issues.  Sherwood testified that she "wanted the [HRC] Commissioner to tell [Jean-Gilles] not to get involved in controversial matters....  [Vanderhoef] and I spoke with the Commissioner and encouraged her to try to work with Daniel so that he would not get himself into the middle of political imbroglios."  (Id. at 52-53.)  If Jean-Gilles "curtail[ed] his public political activity" and did not "appear in the press about controversial events," such actions "would be consistent with what [Sherwood] understood to be the long-standing county policy."  (Id. at 65.)  Although Sherwood conceded that the newspaper article that raised concerns within the County Executive's office in 1996 did not identify Jean-Gilles as a County employee, she insisted, "Everyone knows his title."  (Id. at 46-47.)

Jean-Gilles I did not mount any challenge to a prior restraint on county employees generally because, until Sherwood testified, no one representing plaintiff had any knowledge that the criticism to which he had been subjected in 1996 was part of anything larger than plaintiff's personal situation.  Plaintiff's retaliation claim as articulated in the pre-trial order in Jean-Gilles I focused generally on his public speech advocating for Nyack's minority residents (see Jean-Gilles I Pre-Trial Order, Docket No. 25 at 4-5), and did not mention any County policy restricting employee speech.

Although counsel for Jean-Gilles spent considerable time on Sherwood's testimony during his summation, the court's jury instructions regarding plaintiff's First Amendment

retaliation claim contains no mention of any County policy:

> The plaintiff claims that he was . . . retaliated against because he has a right under
> the First Amendment of the Constitution to be able to exercise a right to free
> speech....  I have already ruled in pretrial motions that the plaintiff's speech on
> issues about the effective functioning of the Human Rights Commission and the
> race policy in county government falls squarely within the rubric of public-
> concerned speech.

(Jean-Gilles I Jury Charge, July 29, 2004 at 13, 15.)  Similarly, the court's jury charge regarding

municipal liability contains no mention of any county policy:

> For our purposes, the plaintiff is relying on what we refer to as Pembaur
> liability....  Under the Pembaur case, a municipality, like Rockland County, may
> be held liable for even a single unconstitutional act by a municipal employee if
> that employee . . . has final policymaking authority in the area in which the action
> was taken.  I charge you that . . . the County Executive is the final policymaker
> with regard to personnel matters relating to county employment, which is the area
> in which the allegedly unconstitutional action was taken vis-a-vis Mr. Jean-Gilles.
> Therefore, as a matter of law, if you find Mr. Vanderhoef liable for violating Mr.
> Jean-Gilles' rights, the County of Rockland is also liable.

(Id. at 20-21.)

Furthermore, the verdict sheet that was sent to the jury contained the following questions:

> 1.  Do you find from a preponderance of the evidence that plaintiff's race was a
> substantial or motivating factor that prompted defendants not to promote him?
> 
>                      *   *   *
> 
> 2.  Do you find from a preponderance of the evidence that plaintiff's public
> speech was a substantial or motivating factor that prompted defendants not to
> promote him?
> 
>                      *   *   *
> 
> 3.  Do you find from a preponderance of the evidence that plaintiff would not
> have been promoted for other reasons even in the absence of consideration of
> plaintiff's public speech?

(Verdict Sheet, Jean-Gilles v. County of Rockland, 00-CV-4861.)  The verdict sheet did not

specify any particular theory about why plaintiff's speech might have been a substantial or

motivating factor in prompting defendants not to promote him – because defendants were

unhappy about Jean-Gilles' proselytizing on behalf of other blacks, or because he was speaking out on controversial matters without first clearing his speech with senior County officials.[1]

On July 29, 2004, the jury returned a verdict for the County, concluding that Jean-Gilles had not proved by a preponderance of the evidence that he would have been promoted but for his criticism of the County's lack of interest in hiring black employees to high level jobs.  The jury did not conclude that plaintiff's race was a factor in the decision. However, the jury concluded that plaintiff's public speech was a substantial or motivating factor in the County's decision not to promote him.  (See Winter Decl., Ex. I; Jean-Gilles I Mem. Order, Aug. 11, 2004 (McMahon, J.))

The next day, plaintiff's counsel moved for entry of a permanent injunction declaring unconstitutional the County's "admitted policy of disallowing public servants from making public comments on controversial issues."  (Bergstein Aff., Ex. 6.)  In his letter motion, counsel stated that he was unaware of the "explicitness and breadth of the County policy" when he filed plaintiff's complaint; he had not learned about the policy during discovery because plaintiff had not deposed Sherwood; and the existence of the policy "did not come up" during his depositions of Vanderhoef and former Chief of Staff, Terry Grosselfinger.  (Id.)

By Memorandum Order of August 11, 2004, this court declined plaintiff's request for an injunction because the County and Vanderhoef "were not on notice that they were facing the

---

[1]In the interest of ascertaining whether this court had in any way amended the pleadings to inject the issue of the County's alleged speech policy into the Jean-Gilles I jury deliberations, I have reviewed – and docketed as exhibits in the current lawsuit – the transcript of my colloquy with the attorneys regarding jury charges, the transcript of my actual instructions to the jury, and the verdict sheet.  As demonstrated above, neither party ever moved this court to amend the pleadings to conform to the evidence adduced at trial and the jury was only asked to consider the claims originally propounded in plaintiff's Jean-Gilles I complaint.

possible entry of injunctive relief" and "did not necessarily gear their proof toward the issues

that would be germane in such a lawsuit." (Winter Decl., Ex. I).  The court agreed that "some of

the testimony offered at trial . . . [was] shocking" and accepted that plaintiff's counsel was taken

by surprise by Sherwood's testimony.  Nonetheless, the court was unwilling to permit plaintiff to

change his theory of the case after the trial had ended.

Both the jury's verdict and this court's refusal to enter an injunction were affirmed by the

Second Circuit.  See Jean-Gilles v. County of Rockland, 151 Fed. Appx. 23 (2d Cir. Sep. 30,

2005).  The Court of Appeals concluded that there was ample evidence to support a jury

conclusion that Jean-Gilles would not have been promoted to the Commissioner's position both

because of his record of incompetence and insubordination and because of the qualifications of

the person who was appointed.

## C.  The Current Lawsuit

Jean-Gilles filed a second lawsuit on November 4, 2005, seeking an injunction against

the County's enforcement of "an unconstitutional prior restraint which prohibits public

employees from speaking out on controversial matters in the community." (Compl. ¶ 1.)  This

court denied  plaintiff's motion for the preliminary injunction, on the ground that there was no

evidence that the policy about which Sherwood testified was still in effect.  I ordered the parties

to take discovery about the scope of any policy that effected a prior restraint on County

employees' speech.

At Ms. Sherwood's February 16, 2006 deposition, she retreated substantially from her

2004 trial testimony regarding the County's alleged public speech policy.  Sherwood stated

definitively that the County does not currently maintain a policy of instructing "certain

employees that they should not be involved in controversial activity.... [or] make certain comments in the community." (Bergstein Aff., Ex. 3 at 47-48.)

But Sherwood went further. She claimed that the County had never observed such a policy. The only policy concerning speech by county employees, according to Sherwood (at her deposition), is the County's check-in policy. Pursuant to this policy, the County Executive's Office, "Ask[s] commissioners and department heads, if they get a call from the press, from the media, that they let us know about it, either before ir afterwards, so that we can know what's going on." (Id. at 8.) Sherwood insisted that this policy only applies to "commissioners and department heads." (Id. at 8, 49.) Plaintiff, of course, is neither.

Sherwood stated that under no circumstances would County employees below the level of commission and department head, ". . . be asked to notify the County Executive's office of comments that they make to the media" when "they speak as private citizens." (Id. at 10.) Moreover, she testified that the County does not currently circumscribe its employees' "political speech in the community," and had never done so. (Id. at 12.) Sherwood also stated that she could not "recall any meetings in which County officials have discussed the circumstances in which County employees can speak out or express their opinions while off duty." (Id. at 5.)

However, when asked whether *any* public comments made by a County employee – as a private citizen – would "raise concerns" in the County Executive's office sufficient to require some form of action by the County, Sherwood repeatedly stated, "It would depend on what [the employee] said." (See, e.g., id. at 18, 19, 21, 22, 24, 25, 28, 29, 31, 33, 34, 35.) According to Sherwood, the expression of controversial opinions on local political or social issues is "fine," as long as the opinions "don't impact upon [the employee's] position." (Id. at 32.) Sherwood

offered that a blatantly racist comment would raise such concerns (id. at 29), but repeatedly

declined to hypothesize about what less egregious public statements might upset the County

Executive.  (Id. at 35-36.)

When asked whether Jean-Gilles' 1996 public statements regarding the ferry and mall

projects would be a cause for County concern (as they obviously were, since the County

Executive's office made so much of them at the time), Sherwood stated:

> [I]t doesn't matter to me or anybody else if he takes a position on a ferry or an
> issue.  He's just got to be, you know, a little careful that he doesn't cause
> problems . . . by . . . bringing his work into it....  I believe [in 1996] he was quoted
> in the paper saying something about – his thoughts about the impact [of the ferry]
> on the black community in Nyack.  That immediately brings his job into it, I
> think.

(Id. at 39-40.)

Sherwood also reiterated her trial testimony about the reasons underlying the County's

concern over potentially inflammatory public statements from County employees:  "Our concern

was that [Jean-Gilles'] comments could have the potential [effect on how the public viewed his

job or how the public viewed his capacity to be a fair investigator in the Human Rights

Department.]  I mean, there's a perception issue here, and we were careful about protecting the

department, and that's what occasioned the conversation we tried to have with him."  (Id. at 23.)

"I think we should expect . . . an investigator to be impartial and fair, nonbiased....  He should

not say biased, unfair, prejudicial things [in the community.]"  (Id. at 31.)  Sherwood confirmed

that her beliefs have not changed "over the years."  (Id. at 33.)

Regarding the section of the 1996 letter stating that employees' "Leading either divisive

public and partisan debate for one group of citizens against another could compromise the

[HRC's] appearance of impartiality," (Bergstein Aff., Ex. 6), Sherwood confirmed that she wrote

the letter – although Vanderhoef signed it – and that the letter amounted to "almost a[n HRC]

mission statement" that "hold[s] true today."  (Bergstein Aff., Ex. 4 at 43-44.)

### D.  Disputed Facts

In its motion papers, the County maintains:

> There is no policy preventing County employees from speaking to the media or
> from speaking out in public on matters of public interest....  There is no County
> policy restricting the speech activities of County employees....  There is no policy
> precluding County employees from expressing their opinions while 'off-duty.'

(Def. Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 at ¶ 8, citing

broadly Ms. Sherwood's Feb. 16, 2006 deposition.)  Moreover, the County states, "to the extent

any County employee wants to contact any media representative about any matter of public or

private concern, he or she is free to do so as long as confidential information is not disclosed."

(Affidavit of Terry Grosselfinger in Support of Defendant's Summary Judgment Motion

("Grosselfinger Aff.") at ¶ 9.).  Defendant concedes that the check-in policy exists but as an

informal County practice, not an unwritten rule, that applies only to County commissioners and

department heads (id. at ¶¶ 9-15) – which, if true, could insulate the County from liability for

First Amendment violations.  See McEvoy, 124 F.3d at 102.

Jean-Gilles disputes each of these contentions.  He claims that the Jean-Gilles I trial

testimony of Sherwood and – to a lesser extent – Vanderhoef establishes a "press policy and

public appearance policy" which was communicated to County employees (not just

Commissioners and department heads) "every year."  (Pl.'s Statement of Undisputed Material

Facts Pursuant to Local Civil Rule 56.1 at ¶ 3, citing Ms. Sherwood's testimony in Jean-Gilles I

at 58.)  Regarding the check-in policy, plaintiff contends that Sherwood's testimony at trial

proved that the policy applied to him, even though he was neither a commissioner nor a

department head and even though his comments on the mall and ferry projects had nothing whatever to do with his job.  The fact that Jean-Gilles was questioned and counseled about his 1996 speech about the ferry and the mall projects is cited as evidence that the policy applied to him, and the fact that the HRC had no responsibility for either project made any claim that the comments were related to his job specious.  (Id. at ¶ 8.)

### E.  Cross-Motions for Summary Judgment

The County moves for summary judgment on four grounds: (1) plaintiff lacks standing to seek the injunction because he is not subject to any speech policy and because he has not asserted a cognizable injury due to it;(2) res judicata bars plaintiff from raising his claim in the instant action, because he should have raised it in Jean-Gilles I; (3) there is no County policy that interferes or in any way limits the exercise of plaintiff's First Amendment rights; and (4) the check-in policy is constitutional insofar as it applies to employees who are policymakers.

Plaintiff moves for summary judgment on the grounds that (1) no matter how the speech policy has been described by County officials at trial or during depositions, it violates plaintiff's First Amendment rights; (2) the policy continues to exist today; (3) the County cannot articulate any interest it may have as an employer that would outweigh the interests of its employees in being free from such restraint; and (4) the policy is also unconstitutional because it is overbroad and grants County officials too much discretion to regulate speech.

## II.  Discussion

### A.  Standard of Review

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Whether any disputed issue of fact exists is for the court to determine. Balderman v. United States Veterans Admin., 870 F. 2d 57, 60 (2d Cir. 1989).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F. 3d 105, 114 (2d Cir. 1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Industries Co., 475 U.S. at 586. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

**B. The Law Relating to Public Employee Speech**

16

The Supreme Court articulated the standard for broad policy limitations on the speech of public employees in <u>Pickering v. Board of Education</u>, instructing trial courts to "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  391 U.S. 563, 568 (1968).

As applied, "The <u>Pickering</u> test involves a two-step inquiry: first, a court must determine whether the speech . . . relates to a matter of public concern; and, second, if so, the balance between free speech concerns is weighed against efficient public service to ascertain to which the scale tips." <u>Melzer v. N.Y.C. Bd. of Educ.</u>, 336 F.3d 185, 193 (2d Cir. 2003) (citing <u>Rankin v. McPherson</u>, 483 U.S. 378, 384 (1987)).

The first step, commonly referred to as the "public concern test," is necessary because "the First Amendment protects an employee only when he is speaking 'as a citizen upon matters of public concern' as opposed to when he speaks only on matters of personal concern.'" <u>Id</u>. (quoting <u>Connick v. Myers</u>, 461 U.S. 138, 147 (1983)).  "Advocacy for a change in public perception and law . . . is certainly a matter of public concern, regardless of the underlying subject matter," <u>Melzer</u>, 336 F.3d at 196, as is "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." <u>City of San Diego v. Roe</u>, 543 U.S. 77, 83-84 (2004).  However, if the speech that led to an employee's discipline was of a personal nature – "for example, a complaint about a change in an employee's duties – the government is granted wide latitude to deal with the employee without any special burden of justification." <u>Id</u>. (citing <u>U.S. v. Nat'l Treasury Employees Union</u> ("<u>NTEU</u>"), 513 U.S. 454, 466 (1995)).  Significantly, the "inappropriate or controversial

character of a statement is irrelevant to the question [of] whether it deals with a matter of public

concern." <u>Rankin</u>, 483 U.S. at 387.  Whether speech relates to a matter of public concern is

"ordinarily a question of law decided on the whole record by taking into account the content,

form, and context of a given statement." <u>Melzer</u>, 336 F.3d at 196.

   Some courts, including both the Second Circuit and the Supreme Court, have questioned

the extent to which the public concern test applies to off-duty speech on topics unrelated to

employment.  For example, in <u>Roe</u>, the Supreme Court noted, "When government employees

speak or write on their own time on topics unrelated to their employment, the speech can have

First Amendment protection, absent some governmental justification 'far stronger than mere

speculation' in regulating it."  543 U.S. at 80 (quoting <u>NTEU</u>, 513 U.S. at 475).  As the Second

Circuit and Supreme Court recognized, just because an employee's speech does not rise to the

level of public concern is "not meant to license wholesale Government disregard of employee

speech rights, especially outside of the workplace." <u>Locurto v. Giuliani</u>, 447 F.3d 159, 174 (2d

Cir. 2006).

   Thus, the Second Circuit recently noted in <u>Locurto</u>, "It is more sensible . . . to treat

off-duty, non-work-related speech as presumptively entitled to First Amendment protection

regardless of whether, as a threshold matter, it may be characterized as speech on a matter of

public concern.... [T]he closeness of a Government employee's off-duty, non-work-related

speech to the heart of the First Amendment then becomes relevant as part of the <u>Pickering</u>

balancing test, to be weighed against the Government's interest...."  447 F.3d at 175.

   If the plaintiff can demonstrate his speech centered on a matter of public concern – or if

the plaintiff's speech concerned off-duty speech unrelated to his employment – the court must

balance the parties' competing interests.  At this second step, "The government has the burden of

showing that despite First Amendment rights the employee's speech so threatens the

government's effective operation that discipline of the employee is justified."  Id.  The Second

Circuit has "recognize[d] that the balancing test's application is not limited to conduct occurring

at or directly relating to the workplace" and that "[a]ttenuation of time, place, or content of

speech from the workplace is ultimately accounted for in the balancing part of the process, but

those factors will not absolutely preclude government regulation."  Id. at 194.

    When courts conduct this analysis, "an employee's status as a policymaker is a

significant factor in balancing the employee's . . . interests against those of the public employer .

. . but 'does not provide an employer with complete insulation.'"  Schallop v. New York State

Dep't of Law, 20 F. Supp. 2d 384, 396 (N.D.N.Y. 1998) (quoting McEvoy v. Spencer, 124 F.3d

92, 103 (2d Cir. 1997)).  "The more the employee's job requires confidentiality, policymaking,

or public contact, the greater the state's interest in firing her for expression that offends her

employer."  Locurto, 447 F.3d at 179 (internal quotations and citations omitted); see also Melzer,

336 F.3d at 197.  Again, this balancing of interests – including determining whether an employee

falls within the policymaking penumbra – poses a question of law for the court.

    Although courts are more willing to find public speech restrictions constitutional when

the employee is a policymaker, the state may also restrict speech of lower level employees.  For

example, in Locurto, the Second Circuit held that the New York police and fire departments'

firing of two officers – for their off-duty participation at a Labor Day parade in which the

officers rode a float that mocked African-American stereotypes – did not violate the officers'

First Amendment right to free speech.  447 F.3d at 163.  The court first observed that it did not

need to resolve whether the speech at issue amounted to public concern speech, "....because, given our resolution of the <u>Pickering</u> balancing test . . . we can assume *arguendo* that the plaintiffs' speech in this case did in fact relate to a matter of public concern." <u>Id</u>. at 175. Although the court found the officers' expressive interests in "comment[ing] on race" were "not insubstantial," the court ultimately held that the government's interest in "maintaining a relationship of trust between the police and fire departments and the communities they serve" outweighed plaintiffs' interests. <u>Id</u>. at 183. "The First Amendment does not require a Government employer to sit idly by while its employees insult those they are hired to serve and protect." <u>Id</u>.; <u>see also</u> <u>Melzer</u>, 336 F.3d at 198-99 (holding that defendant school board's termination of plaintiff teacher who belonged to association that advocated sexual relations between men and boys, was constitutional because board's interest in orderly operation of high school outweighed teacher's interest in commenting on areas of public concern).

Against that backdrop, I consider the issues raised by both parties in their cross-motions for summary judgment.

**C.  Jean-Gilles Has Standing to Bring This Lawsuit**

In order to have standing to bring a lawsuit, a plaintiff must: (1) have suffered "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual and imminent, not conjectural or hypothetical," (2) "show that the injury is caused by the challenged activity," and (3) "show that the injury is apt to be redressed by a remedy the court is prepared to give." <u>See</u> <u>Latino Officers' Ass'n v. Safir</u>, 170 F.3d 167, 170 (2d Cir. 1999) (internal quotations and citations omitted). "A plaintiff bringing a pre-enforcement facial challenge against a statute need not demonstrate to a certainty that it will be prosecuted under the

statute to show injury, but only that it has 'an actual and well-founded fear that the law will be enforced against' [him]." Vt. Right to Life Comm. v. Sorrell, 221 F.3d 376, 382 (2d Cir. 2000) (quoting Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 393 (1988)).

Moreover, "In determining whether a litigant has standing to challenge governmental action as a violation of the First Amendment, we have required that the litigant demonstrate 'a claim of specific present objective harm or a threat of specific future harm.'" Meese v. Keene, 481 U.S. 465, 472 (1987) (quoting Laird v. Tatum, 408 U.S. 1, 14 (1972)). "Allegations of a 'subjective chill [of First Amendment rights] are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" Latino Officers Ass'n, 170 F.3d at 170 (quoting Laird, 408 U.S. at 13-14). "Rather, to establish standing in this manner, a plaintiff must proffer some objective evidence to substantiate his claim that the challenged [regulation] has deterred him from engaging in protected activity." Bordell v. General Elec. Co., 922 F.2d 1057, 1060-61 (2d Cir. 1991). However, "'Traditional requirements of standing are relaxed when the matter involves a prior restraint of speech or expression because of the potential for abuse of First Amendment rights.'" Lusk v. Village of Cold Spring, 418 F. Supp. 2d 314, 320 (S.D.N.Y. 2005) (quoting Knoeffler v. Town of Mamakating, 87 F. Supp. 2d 322, 332 (S.D.N.Y. 2000).

In view of the Second Circuit's recent decision in Latino Officers Ass'n, 170 F.3d at 168, it appears that plaintiff has standing to assert his claim. There, the plaintiff Latino Officers Association ("LOA") – an organization formed for the purpose of advancing the interests of Latino members of the New York Police Department ("NYPD") – challenged an NYPD procedure that "required officers to provide notice to the police department in advance of any

speaking engagement . . . and to provide a written summary of the speech the next business day

after the engagement."  In support of its preliminary injunction application, plaintiff produced

evidence that the LOA President had been denied permission to speak publicly on one occasion,

that additional LOA members had since "declined to [make public comments about non-

confidential information] because of NYPD policy," and that the LOA President "speculated that

he would be asked in the future to make such comments."  Id. at 170.  The Second Circuit found

that the above examples constituted "sufficient evidence to substantiate [the LOA's] claim that

the Procedure deterred its members from exercising their First Amendment rights" and that

"such evidence satisfies the standing requirement."  Id.

　　　　Here, Jean-Gilles was chastised on one occasion (in 1996) for publicly expressing his

opinion regarding the ferry and mall projects – statements that on their face do not appear to

have anything to do with his job at the HRC – and he was told to be careful about what he says

in public.  He avers that he has refrained from making additional public comments on

controversial issues ever since, although he "continue[s] to hold strong political views."  (Jean

Gilles Decl., ¶ 4.)[2]  Jean-Gilles has therefore alleged not merely a "subjective chill" but both a

_____

　　　　[2]According to Jean-Gilles, the revelation at his previous trial regarding the County's
public speech:

> has made me even more apprehensive about speaking out on matters of public
> importance than ever before.  It is true that, after County officials counseled me
> about my publicized speech on a local ferry and shopping center, I began to think
> twice about speaking out.  But the testimony which surfaced at trial in July 2004
> convinces me that I will suffer discipline or counseling if I speak out in the future
> on controversial public matters which might be reported in the media.  For this
> reason, although I continue to hold strong political views, I am hesitant to speak
> out in this manner.

(Jean-Gilles Decl. ¶ 4.)

"specific present objective harm" (the chilling of his speech) and "a threat of specific future harm'" (disciplinary action if he chooses to speak publicly on controversial issues).  <u>Latino Officers Ass'n</u>, 170 F.3d at 170.

The County argues that Jean-Gilles' "speech has been anything but chilled," given that the local newspaper quoted him in February 6 and 11, 2006 articles regarding the recent Haitian elections.  (Def.'s Mem. in Opp. to Summ. J. at 4, citing Winter Decl., Exs. D-E.)  <u>Bordell v. General Elec. Co.</u>, 922 F.2d 1057, 1060 (2d Cir. 1991) (holding plaintiff employee lacked standing to challenge policy implemented by his employer – a commercial administrator of a government naval nuclear program facility – mandating formal approval before employees spoke publicly about program, in part, because plaintiff "concedes, since the [policy was implemented], he has been extensively quoted in the local media concerning [employer's] environmental, health, and safety record, and has never been punished or threatened with punishment as a result.").  In <u>Bordell</u>, the challenged policy prohibited employees of General Electric from publicly commenting on "information" regarding the naval nuclear program "that may appear without authorization in the public domain" without prior approval; the plaintiff had made public comments "concerning [the program's] environmental, health, and safety record" with impunity.

Here, the fact that Jean-Gilles made public comments about politics in a foreign country does not mean he could make comments about local issues – as he tried to do a decade ago – with similar impunity.  Although plaintiff has not identified a specific instance when he wanted to speak publicly on a controversial subject but refrained, evidence regarding his position as a prominent member of the Nyack Democratic party and the NAACP – as well as his well-

---

documented public quotes from 1996-1997 – persuades me that there is at the very least a question of fact about whether he has refrained from exercising his free speech rights due to the chilling effects of defendant's purported policy.

I agree with defendant that the declaration quoted in footnote two, *supra*, standing alone, is not nearly as persuasive as the affidavits offered by plaintiff in <u>Meese v. Keene</u>.  481 U.S. 465 (1987).  The <u>Meese</u> affidavits included a Gallup Study opinion poll and non-party statements that both vividly supported the plaintiff's contention that his personal and political reputation would be injured if he exhibited Canadian films deemed "political propaganda" under the Foreign Agents Registration Act.  <u>Id</u>. at 473-74.  However, Jean-Gilles already has been reprimanded by senior County officials for speaking out publicly on issues of local concern, and has been counseled to be careful about what he says.  With this context, his declaration – while perhaps "self-serving" (Def.'s Reply in Support of Summ. J. at 5) – is sufficient to support <u>Latino</u> <u>Officers</u> standing.

Of course, plaintiff did not know of the existence of any policy until the trial in <u>Jean-Gilles I</u>, so his speech could not have been chilled by the policy prior to the trial of <u>Jean-Gilles I</u>. If plaintiff cannot identify at trial instances when his speech was chilled after he learned of the existence of a policy (assuming that the court finds that such a policy exists), I may have to revisit the issue of standing.

Defendant argues that "to the extent Plaintiff wants to argue that he suffered a cognizable First Amendment injury by the County's refusal to promote him to the job of Commissioner of Human Rights, that issue was foreclosed by the jury's verdict in <u>Jean-Gilles I</u> that Plaintiff was not promoted for reasons other than his speech activity."  (Def.'s Mot. for Summ. J. at 7.)  As

discussed below, defendant is correct that this particular issue has already been litigated and plaintiff's attempt to re-litigate would therefore be barred as res judicata. However, nowhere in plaintiff's complaint or motion papers does plaintiff suggest that his current First Amendment claim is based on the County' failure to promote him.

Finally, I note that the arguments propounded by defendant for why plaintiff lacks standing all turn, to some degree, on the existence or lack of existence of any prior restraint policy that is applicable to plaintiff. Because there is a question of fact concerning the existence of such a policy, these arguments do not overcome the presumption of standing that is raised by plaintiff's allegations and the Second Circuit's decision in Latino Officers.

**D. This Lawsuit is Not Barred by Res Judicata**

An action is barred by res judicata when it involves the same claim – or "nucleus of operative fact" – as an earlier suit. Waldman v. Village of Kiryas Joel, 207 F.3d 105, 108 (2d Cir. 2000). Two actions arise from the same claim when (1) the underlying facts are related in time, space, origin or motivation, (2) when they form a convenient trial unit, and (3) when their treatment as a unit conforms to the parties' expectations. See id. "Whether there is claim preclusion depends upon whether the same or connected transactions are at issue and the same proof is needed to support the claims in both suits or, in other words, whether facts essential to the second suit were present in the first suit." Curtis v. Citibank, N.A., 226 F.3d 133, 139 (2d Cir. 2000); see also Lopez v. Ward, 681 F. Supp. 192, 196 (S.D.N.Y. 1988).

Under the doctrine of res judicata, "A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Legnani v. Alitalia Linee Aeree Italiane, S.p.A., 400 F.3d 139, 141 (2d Cir. 2005)

(quoting St. Pierre v. Dyer, 208 F.3d 394, 399 (2d Cir. 2000)).  Thus, res judicata applies "not only to what was pleaded, but also to what could have been pleaded."  Cameron v. Church, 253 F. Supp. 2d 611, 619-20 (S.D.N.Y. 2003) (quoting In re Teletronics Servs., Inc., 762 F.2d 185, 190 (2d Cir. 1985)).  This means that the doctrine applies to facts learned after the filing of the earlier complaint when such facts are merely "additional examples of the earlier-complained of conduct."  Waldman, 207 F.3d at 113.

Application of res judicata principles is not a rigid exercise.  "The notion of a 'transaction' is prismatic in the sense that it takes coloration from its surroundings.  It must be given a flexible, common-sense construction that recognizes the reality of the situation."  Interoceanica Corp. v. Sound Pilots, 107 F.3d 86, 91 (2d Cir. 1997).  Thus, when analyzing the three factors cited in Waldman to determine if a claim is barred, the Restatement (Second) of Judgments recommends a "pragmatic[]" approach.  § 24(2).

1. The two lawsuits allege different claims and injuries, and require plaintiff to establish different facts

The claim in the current case is distinct from the retaliation claim that was actually litigated in Jean-Gilles I.  In Jean-Gilles I, plaintiff's complaint alleged that he was injured by his failure to be promoted to HRC Commissioner, and the injury was caused by Vanderhoef's "refus[al] to appoint [plaintiff] . . . because plaintiff is black and because plaintiff had opposed [Vanderhoef's] policies of racial discrimination."  (Winter Decl., Ex. G at ¶¶ 21-23 and Section V.)  Thus, the essence of plaintiff's claims in Jean-Gilles I was the County's alleged institutional bias against minorities, which played out against plaintiff's personal interest.

In order to succeed on his retaliation claim in Jean-Gilles I, Jean-Gilles needed to

establish: "(1) his . . . speech was constitutionally protected; (2) he . . . suffered an adverse employment action; and (3) a causal connection exists between the speech and the adverse employment action so that it can be said that the speech was a motivating factor in the determination." Washington v. County of Rockland, 373 F.3d 310, 320 (2d Cir. 2004). He failed to persuade the jury of the third factor.

In contrast, Jean-Gilles' current complaint claims he has suffered and is suffering injury as a result of his chilled speech, which injury was and is caused by the County's unconstitutional policy of limiting County employees' public speech. (See Compl. at ¶¶ 1, 5, 24.) As previously discussed, in order to succeed on this claim, Jean-Gilles would arguably need to establish that his speech was of a public concern and his expressive interests outweighed any interests offered by the County for limiting such speech. Pickering, 391 U.S. 563, 568 (1968). Thus, these claims are entirely different than the claims litigated in Jean-Gilles I.

The Jean-Gilles I trial transcript further illustrates how different these claims are. At trial in Jean Gilles I, plaintiff sought to persuade the jury that defendants harbored an institutional bias against blacks, and that defendants retaliated against Jean-Gilles for his public speech regarding the impact of the ferry project on the black community because defendants dislike blacks – not because defendants maintain a policy limiting County employees from publicly speaking on controversial subjects.

As a result, most of plaintiff's case-in-chief was dedicated to showing that Jean-Gilles was highly qualified for the promotion he did not get. Plaintiff sought to demonstrate his able stewardship of HRC during his tenure as Acting Director, and the County's alleged failure to promote him because of his public complaints "with regard to the Commission." (Vanderhoef

Trial Test., Jul. 26, 2004 at 61; see generally Vanderhoef Trial Test., Jul. 26-27, 2004.)  When asked why he refused to appoint Jean-Gilles as HRC Commissioner, Vanderhoef responded, "I mean, *the history which you've gone through here during the day* was pretty much indicative of his problems at work, his belligerence with the administration, and his general desire, I think, to be less productive than most of our employees in county government."  (Vanderhoef Trial Test., Jul. 26, 2004 at 72) (emphasis added.)

The five pages from plaintiff's direct examination of Vanderhoef attached to plaintiff's moving papers essentially reflect the only moments in plaintiff's direct examination that deal with Jean-Gilles' public speech.  The vast majority of plaintiff's direct examination of Vanderhoef (which took up 96 pages of transcript) deals with subjects more closely related to the claim plaintiff actually brought.  For example, plaintiff asks whether Vanderhoef was aware of plaintiff's "concern[] about the underrepesentation of minorities in managerial positions in Rockland County."  (Id. at 19.)

Thus, the County's distaste for Jean-Gilles' public (non-HRC-related) activism was clearly not the focal point of plaintiff's case-in-chief.  Rather, the evidence was introduced as background concerning the relationship between Jean-Gilles and his employer.  It could have been nothing else; the 1996 incidents occurred more than three years prior to the commencement of plaintiff's lawsuit and so were time-barred as a basis for relief.  And plaintiff clearly believed that he had been singled out for reprimand in 1996 because he was black, not because of some prior restraint on public speech that was applicable to all county employees.

Another indication that plaintiff was not pursuing an attack on a county policy restricting employees' public speech is that plaintiff's counsel never once asked two of plaintiff's primary

28

witnesses – Ram Nagubandi and Myria Jean-Gilles – any questions regarding plaintiff's public speech on controversial subjects that were not related to the work or the make-up of the HRC. (See generally Nagubandi Trial Test., Jul. 28, 2004; Myria Jean-Gilles Trial Test., Jul. 27, 2004.) Instead, plaintiff's counsel asked Nagubandi to opine on the "lack of commitment that you perceived by the County Executive to human rights" (Nagubandi Trial Test., Jul. 28, 2004 at 21), and "the ineffectiveness of the [HRC.]" (Id. at 24.) And although plaintiff asked his remaining witness, Grosselfinger, a handful of questions regarding Jean-Gilles' "political activity" (see, e.g., Grosselfinger Trial Test., Jul. 27, 2004 at 12, 14, 15, and 17), the direct examinations of Messrs. Grosselfinger and Nagabundi focus almost exclusively on the HRC Commission hiring process.

Plaintiff's own testimony touches on his public speech, however, the apparent purpose of the testimony is to demonstrate that his public speech did not "inhibit[] people from coming to [Jean-Gilles] and complaining [about human rights violations]." (Daniel Jean-Gilles Trial Test., Jul. 27, 2004 at 11.) Plaintiff's testimony generally shows that Jean-Gilles' public speech was but one facet of Jean-Gilles' overall behavior that led to the County's decision not to promote him. For example, Jean-Gilles also spent considerable time testifying to his refusal to work overtime (id. at 27), his "badmouthing the [HRC] Commissioner" (id. at 12-13), his public observation that the HRC lacked a full complement of commissioners (id. at 28), his complaint to the local legislature regarding "mismanagement in [the HRC] office" (id. at 30), and his public grievance regarding the County's "failure to have a fair housing board as the legislation contemplated." (Id. at 32.)

Only when the defendants called Ms. Sherwood to the witness stand did evidence of a

29

public policy that might constitute an unconstitutional prior restraint on the First Amendment speech rights of public employees begin to emerge.  Defendants, not plaintiff, injected the issue of a county policy (whatever that policy might be) into the case!

Nor does Sherwood's testimony about the existence of the County speech policy – as revealed at trial – merely amount to "another example" of the "earlier complained of conduct," sufficient to bar the current claim as res judicata.  Waldman, 207 F.3d at 113.  The earlier complained of conduct was an institutional bias against minorities; the current complained of conduct is a broad policy limiting County employees' public speech.  The issues are not the same.

Finally, the jury's conclusion that "plaintiff's public speech was a substantial or motivating factor that prompted defendants not to promote him" (Verdict Sheet, Jean-Gilles v. County of Rockland, 00-CV-4861), does not mean that the parties litigated any claim concerning the existence of a prior restraint policy applicable to all county employees who spoke out on controversial issues.  The jury was not asked to opine on the constitutionality of any County speech policy; indeed, it was not necessary for the jury to find that there was any generally applicable policy in order to conclude that plaintiff's speech was a factor in the County's employment decision.

Thus, Jean-Gilles mirrors the *pro se* plaintiff inmate in Lopez, who originally filed suit against New York City and the warden, alleging his constitutional rights were violated when he did not receive timely medical attention, causing the loss of use of his right eye.  681 F.Supp. at 193.  After the district court dismissed this complaint for failure to state a claim, plaintiff filed a second complaint, again naming New York City (and several additional parties) as a defendant

30

and, this time, alleging that the City had implemented an unlawful policy of denying inmates

adequate medical care that deprived plaintiff of his constitutional rights.  The district court

rejected the City's argument that plaintiff's new claim against the City was barred under res

judicata:

> Although the immediate injury in both actions is Lopez's loss of eyesight, the
> essential facts in the amended complaint, and the evidence necessary to support
> Lopez's claims, involve the practice of an official policy or custom of
> acquiescence in or implicit ratification of the . . . denial of adequate medical care
> to inmates....  In contrast, Lopez 1 involved allegations of a single incident....  As
> already noted, [the dismissal in Lopez I] is binding on this court and if Lopez
> establishes that his rights were violated without establishing that they were
> violated pursuant to an illegal City policy, he cannot relitigate the issue of
> whether the City should be held vicariously liable for a single violation of
> Lopez's rights.

Id. at 197 (internal quotations omitted).[3]  Relative to the claims and facts asserted in the two

Lopez lawsuits, the claim and the underlying facts in the current case are even more different

from the claims and evidentiary record made in Jean-Gilles I.

    2.  Plaintiff's lack of knowledge of the policy prior to the Jean-Gilles I trial is reasonable

    Plaintiff does not dispute that the County's alleged public speech policy existed at the

time plaintiff filed his complaint in Jean-Gilles I.  However, the key issue is not whether the

policy existed at that time, but whether plaintiff knew about it or should have known about it

when he filed his earlier complaint.

    Defendant's contention that plaintiff knew of this County policy in 1996 (a curious

position for the County to take, since it vehemently denies the existence of any speech policy

---

    [3]In reaching this conclusion, the court noted its obligation to "be mindful that a *pro se*
litigant should be afforded every reasonable opportunity to demonstrate that he has a valid
claim."  Lopez, 681 F.Supp. at 197.

applicable to Jean-Gilles!), but failed to challenge it in <u>Jean-Gilles I</u>, is contradicted by
Sherwood's testimony at the trial in <u>Jean-Gilles I</u>.  Although Sherwood testified that the policy
was applicable to all "county employees and department heads," she also testified that it was
discussed annually at "cabinet meetings" that were attended by "commissioners and department
heads" – not by lower level county employees like plaintiff.  In view of this testimony, plaintiff's
statement that he "had no way of knowing that the disciplinary action in 1996 emanated from a
broader speech policy applicable to other employees" (Pl.'s Reply Mem. in Support of Summ. J.
at 2; <u>see also</u> Jean-Gilles Decl. at ¶ 4), makes perfect sense.  Vanderhoef's September 20, 1996
memo to Jean-Gilles does not suggest the existence of any prior restraint policy generally
applicable to all county employees (Bergstein Aff., Ex. 6) and nowhere else in the record is there
a suggestion that employees at Jean-Gilles' level were told about any policy (which could be
thought to support the County's position that no policy applicable to lower level employees ever
existed).  Jean-Gilles clearly believed he was being singled out for silencing on the basis of race.
That is the claim he litigated.

Of course, "Res judicata applies even where new claims are based on newly discovered
evidence, unless 'the evidence was either fraudulently concealed or it could not have been
discovered with due diligence.'"  <u>L-Tec Elec. Corp. v. Cougar Elec. Org., Inc.</u>, 198 F.3d 85, 88
(2d Cir. 1999) (quoting <u>Saud v. Bank of New York</u>, 929 F.2d 916, 920 (2d Cir. 1991)).  In <u>L-
Tec</u>, the plaintiff corporation sold electronic goods to defendant corporation even after the
defendant was temporarily dissolved for failure to pay taxes.  Upon its reinstatement, defendant
refused to pay for goods delivered during its dissolution.  Plaintiff sued defendant and
defendant's individual officers; the district court dismissed the claims against the individuals but

allowed the claims against the corporation to proceed.  Shortly after dismissal, plaintiff's counsel

learned facts that allegedly demonstrated that the individual officers had "been transacting

business through an unincorporated entity."  Id. at 86.  Although plaintiffs amended their

complaint, asserting new claims against the individuals, the amended complaint was dismissed

as res judicata, in part because plaintiff "could have ascertained this information through . . . pre-

filing investigation or discovery upon the original complaint."  Id. at 88.

There is no evidence before the court tending to show that Jean-Gilles could have

uncovered the existence of a prior restraint policy that was generally applicable to all county

employees – again, Sherwood's testimony suggests that he would have had no reason to know

about the policy, because he would not have been at meetings where it was discussed (possibly

because it did not apply to him, but on this point her testimony is, at best, internally

inconsistent).  Moreover, given plaintiff's theory in Jean-Gilles I, there is no particular reason

why he should have deposed Sherwood or geared his pre-trial questioning of other witnesses

toward the existence of a policy restraining the free speech rights of county employees.

Although I do not doubt the possibility that plaintiff *could* have learned of the existence of the

County's alleged speech policy during discovery in a race-based discrimination lawsuit, it is far

from obvious that plaintiff's reasonably diligent discovery efforts necessarily *would* have

revealed the existence of such a policy.

For all of the foregoing reasons, the plaintiff's current claim is not barred as res judicata.

### D.  A Question of Material Fact Bars Summary Judgment on the Merits.

Turning to the merits of Jean-Gilles' lawsuit, plaintiff argues that the County's policy

limiting employees from speaking publicly on controversial issues violates his First Amendment

rights.  Specifically, plaintiff argues that 1) the County's policy requiring "county employees and department heads" to "check in" before speaking on matters of public concern (Bergstein Aff., Ex. 1 at 48) violates his First Amendment rights when the County applies the policy in the non-work context (Pl.'s Mem. in Supp. of Summ. J. at 10); 2) the County's "other formulations of the speech policy are also unconstitutional" insofar as plaintiff's interests outweigh the County's interest in maintaining these policies (id. at11); and 3) all of the County's "speech policies are overbroad and grant the County officials too much discretion to regulate speech."  (Id. at 16.)

In response, defendant argues that 1) the check-in policy is constitutional, because it applies only to senior policy-making officials, and 2) there are no other speech policies in existence that apply to employees at Jean-Gilles' level.

Questions of material fact – namely, inconsistencies between Ms. Sherwood's testimony at Jean-Gilles I and her testimony in this matter, as well as inconsistencies between Sherwood, Grosselfinger and Vanderhoef's sworn statements regarding the County's various speech policies – preclude me from reaching the conclusion that the check-in policy (or any other County policy) applies to Jean-Gilles.  If the check-in policy applies to lower-level county employees (which was the fair import of the testimony at the prior trial) – either because it applies to everyone at all times, or because it applies whenever some senior county official decides that certain speech "relates to" a lower level county employee's job – then the Court must engage in Pickering balancing.  Until I have reached a final conclusion about what policies do or do not exist, or to whom they apply, I cannot dispose of this case.

There will, therefore, be a trial in this matter.  Because plaintiff seeks only injunctive relief, the matter will be tried to the court in accordance with the court's rules on bench trials.  If,

relief, the matter will be tried to the court in accordance with the court's rules on bench trials.  If, at the end of that trial, I conclude that there is no policy applicable to persons in plaintiff's position, the matter will be concluded.  If I conclude that there is a policy applicable to persons in plaintiff's position, I will engage in <u>Pickering</u> balancing.

The trial will begin on January 29, 2007.  The final pre-trial conference will take place at 2:00 p.m. on January 26, and the joint pre-trial order and related submissions prescribed in this court's individual rules shall be submitted by January 19.

### III.  <u>Conclusion</u>

Plaintiff and defendant's cross-motions for summary judgment are denied.  This constitutes the decision and order of the court.

Dated: November 29, 2006

_____
U.S.D.J.

BY FAX TO ALL COUNSEL

35